| | |
|---|---|
| XUNXIAN LIU,<br><br>     Plaintiff,<br><br>     v.<br><br>MARY CATHERINE BUSHNELL,<br>WENDY LIFFERS and<br>DAVID SHURTLEFF,<br><br>     Defendants. | Civil Action No. TDC-17-1398 |

## MEMORANDUM OPINION

Self-represented Plaintiff Dr. Xunxian Liu, a molecular biologist formerly employed by the National Institutes of Health ("NIH") has filed suit against Defendants Dr. Mary Catherine Bushnell, Wendy Liffers, and Dr. David Shurtleff, alleging race, color, national origin, and sex discrimination, and retaliation, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2012); age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634 (2012); and perjury under federal and state law. Defendants have moved for dismissal of, or summary judgment on, Dr. Liu's claims. Dr. Liu has moved to have defense counsel recused for an alleged conflict of interest. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Liu's Motion to Recuse is DENIED, and Defendants' Motion for Summary Judgment is GRANTED.

## BACKGROUND

Dr. Liu, a man of Chinese origin who was 60 years old at the time of the relevant events, is trained as a molecular biologist. In October 2005, he was hired by NIH for a position as a Biologist, at the pay grade of GS-11. Dr. Bushnell is the Scientific Director of the National Center for Complementary and Integrative Health ("NCCIH"), a division of NIH. In 2012, Dr. Liu interviewed with Dr. Bushnell for a position in the newly opened pain-research lab in NCCIH, but was not hired because, at that point, Dr. Bushnell had no need for a molecular biologist.

In December 2014, Dr. Liu's temporary assignment in another division of NIH was coming to an end, so Dr. Shurtleff, the Deputy Director of NCCIH and Dr. Bushnell's supervisor, contacted Dr. Bushnell to see if she now had a need for a molecular biologist. On December 17, 2014, Dr. Liu met with Dr. Bushnell and two of Dr. Bushnell's Principal Investigators, including Dr. Yarimar Carrasquillo. During that meeting, Dr. Bushnell explained that Dr. Liu would be assisting two Principal Investigators on their experiments, and that Dr. Bushnell would be his supervisor. The meeting went well, so Dr. Liu was scheduled to meet with Dr. Shurtleff on January 5, 2015 to discuss his transfer, and to start in NCCIH on January 12. Dr. Liu, however, reported to NCCIH on December 22, 2014, when Dr. Bushnell was on vacation.

### I. Purchase Card

When Dr. Liu arrived, Dr. Carrasquillo had not yet left for her vacation. Dr. Liu asked her if he could purchase some supplies. Dr. Carrasquillo authorized him to purchase a notebook and a lab coat with her purchase card and explained that the purchase card had to be signed out and then returned after use, together with purchase receipts. Dr. Liu used Dr. Carrasquillo's

purchase card on December 22, 23, 29, and 30 for a total of $3,274.01 in purchases. He did not sign out the purchase card or provide his purchase receipts, as required. When Dr. Carrasquillo eventually learned of Dr. Liu's purchases, she asked him to provide all of his receipts and to return all of the purchased items. According to Dr. Liu, he returned all the items, with the exception of pipettes that he had already unwrapped. According to Dr. Carrasquillo and Dr. Bushnell, Dr. Liu refused to return some of the items he purchased, valued at over $1,000. As a result of his refusal, Dr. Bushnell recommended that Dr. Liu be suspended for two days. Dr. Shurtleff mitigated that recommendation to an official reprimand.

When Dr. Carrasquillo discussed Dr. Liu's unauthorized purchases with him, it became clear that he had ordered supplies so he could conduct his own experiments. Dr. Liu also began questioning Dr. Carrasquillo's experiment design and refusing to follow her instructions. Dr. Bushnell reminded Dr. Liu that his job was to assist the Principal Investigators in conducting their experiments, which involved adhering to the protocols they had devised, and that he was not permitted to conduct independent research. In response, Dr. Liu complained about having to work with two different Principal Investigators and asked to be promoted to GS-12 if he was to continue with that structure. He also extensively criticized Dr. Carrasquillo's experiments, asserting to Dr. Bushnell that, if he had designed the experiment, he would "know [the] answers in five days" and stating that he should be allowed to perform the required experiments "with my own protocols" and "explain the reason later." Joint Record ("J.R.") 970. As a result of this friction, Dr. Liu's role in the lab was changed. Dr. Bushnell informed him that, moving forward, he would be working only on her projects. She also informed him that she could not promote him to GS-12. Dr. Liu's position did not have promotion potential to GS-12, and for him to achieve that level, he would have had to apply and be selected for an open GS-12 position.

## II. Job Performance

On January 13, 2015, Liu signed an Employee Performance Plan for his NCCIH position that outlined the critical elements of his position. At around the same time, Dr. Bushnell informed Dr. Liu that he would be assisting her to develop an experiment studying the effects of capsaicin and histamines on the spinal cord. According to Dr. Bushnell, Dr. Liu had difficulty with various aspects of the experiment development. Dr. Liu was first asked to conduct a literature review and provide summaries of relevant scientific literature, but he provided articles that did not address the requested topics and failed to provide adequate written summaries of the articles. When Dr. Bushnell asked him to create a table of past capsaicin and histamine studies, correlated with experimental techniques and outcomes, Dr. Liu again had difficulty. The chart he produced was difficult for other scientists to decipher. On February 10, 2015, Dr. Bushnell redirected Dr. Liu to drafting an outline of the capsaicin/histamine study, including laboratory protocols. As part of that process, he was to make a list of any supplies that would be needed but which were not already in the laboratory. Although Dr. Bushnell instructed him not to place any orders before discussing the study proposal with her, Dr. Liu attempted to order supplies for the experiment on February 11, before drafting the study proposal or speaking with Dr. Bushnell. Dr. Liu then approached another researcher in the laboratory seeking help on writing the protocol. The experimental protocol he eventually submitted to Dr. Bushnell consisted of material copied from a protocol created by another researcher and new procedures that, in Dr. Bushnell's estimation, did not make sense and contemplated sample sizes too small to produce statistically reliable results. Dr. Bushnell concluded that Dr. Liu either did not understand or refused to follow her directions.

4

As a result, Dr. Bushnell determined that Dr. Liu did not have the necessary skills to be a main investigator on a study. She assigned him instead to the task of rating rat and mouse pain behavior from videos. Dr. Bushnell informed Liffers, the NCCIH Executive Officer, of her decision and of her conclusion that Dr. Liu should be placed on a Performance Improvement Plan ("PIP"). During this time period, Dr. Liu berated Dr. Bushnell and criticized other staff members' work on several occasions during weekly staff meetings.

Dr. Liu began his new pain rating assignment in March. Despite receiving a model for recording his observation data, Dr. Liu initially failed to provide his data in the same format and did not conform his observation records to the laboratory template despite additional explanation. His ratings were also inconsistent with those of the other raters and with the scientific literature, and he had used incorrect statistical tools to analyze his data. As a result, Dr. Liu's ratings could not be used as part of the experiment data set, and other investigators involved in the experiment requested that he not be assigned as a rater in the future.

Meanwhile, in February 2015, Dr. Liu submitted a request for funding to attend a conference. In response, Dr. Bushnell explained in an email her general policy that she would approve funding only if the person was presenting a paper at the conference or attending a conference to learn a specialized research technique. More specifically, she told Dr. Liu that all of her 2015 conference funds had already been allocated and encouraged him to instead consider conference opportunities in 2016. Beyond this email response, Dr. Bushnell did not provide a formal response to his request.

### III. Performance Evaluation

On April 9, 2015, Dr. Bushnell wrote up Dr. Liu's performance review. Employees are evaluated on the critical elements in their Employee Performance Plan and are given one of five

ratings for each element: "AO" for Outstanding, "AM" for Achieved More than Expected Results, "AE" for Achieved Expected Results, "PA" for Partially Achieved Expected Results, and "UR" for Achieved Unsatisfactory Results. Dr. Bushnell gave Dr. Liu a "UR" rating in a number of critical elements, including three elements in the category of Individual Performance Outcomes. First, on the element of "Laboratory Management," Dr. Bushnell asserted that Dr. Liu was "grossly negligent in maintaining laboratory inventory," based on his unauthorized purchases, and stated that he was unable to organize his observation data into a usable spreadsheet. J.R. 1282.

Second, on the element of "Research and Technical Knowledge," Dr. Bushnell rated Dr. Liu's performance inadequate in a number of subcategories, including, (a) "Has superior understanding of the pain research area," noting his failure to demonstrate the necessary basic understanding of the laboratory's field of research; (b) "Independently keeps abreast of new approaches and is knowledgeable about scientific resources," citing his difficulties in finding and summarizing relevant pain research articles; (c) "Participates in the writing of laboratory experiments and protocols," citing his failure to develop a viable protocol for the capsaicin/histamine experiment; (d) "Selects the appropriate methodology and procedures to meet the experimental objectives," again citing his failure to develop a viable protocol for the capsaicin/histamine experiment; (e) "Conducts day-to-day operations of relevant protocols," explaining that Dr. Liu's inability to develop a workable protocol made him unable to move on to putting a protocol to use in experiments; and (f) "Evaluates research data using appropriate analytical tools and programs," noting the inconsistency of his ratings of the rat and mouse pain videos.

Third, on the element of "Training/Supporting Staff/Organization Skills/Team Work," Dr. Bushnell found Dr. Liu's performance inadequate in the subcategories of (a) "Acts as a resource for others in the lab," (b) "Assists peers," (c) "Organizes, plans, and prioritizes work," (d) "Adheres to time lines provided by supervisor," (e) "Establishes short- and long-term work related goals and priorities, and discusses these regularly with supervisor," and (f) "Interacts with colleagues and supervisor in a professional and respectful manner." J.R. 1283-84. As a basis for her rating, she cited, among other things, Dr. Liu's disrespectful comments during staff meetings and noted that he took "substantially" longer than other laboratory members to complete his assigned tasks. J.R. 1284.

## IV.     Performance Improvement Plan

According to Dr. Bushnell, she told Dr. Liu of his unacceptable performance ratings on May 8, 2015, an assertion that Dr. Liu disputes. On May 21, 2015, she provided Dr. Liu formal notice, in the form of a letter, that she was placing him on a 60-day Performance Improvement Plan ("PIP"). The PIP set out seven assignments for Dr. Liu to complete. For the critical element of Laboratory Management, Dr. Liu was given one week to provide all of his data and explanatory notes for the projects he had so far completed. For the critical element of Research and Technical Knowledge, he was given three assignments: (1) within one week he was to write summaries of scientific studies, properly referenced and accompanied by a reference list, addressing restraint stress and pain in rats; (2) within one month he was required to analyze data from previous experiments conducted by the lab, in consultation with Dr. Mark Pitcher, a post-doctoral fellow in the lab; and (3) within one month, he was required to conduct a literature review of studies of pain and its relationship to heart rate and to compare the data he had compiled to the data in the literature. For the critical element of Training/Mentoring, he was also

given three assignments, all to be completed within one week. Two of the assignments were to upload the data required for the Laboratory Management assignment to the laboratory's shared drives and provide written summaries of how the data were organized; the third was to meet with Dr. Pitcher to learn the proper data analysis technique needed to complete his Research and Technical Knowledge assignment. The PIP required that Dr. Liu raise his performance level to "Partially Achieved Expected Results," the rating one step above his Unsatisfactory rating, on each of the identified critical elements. If he failed to do so, Dr. Bushnell would initiate termination proceedings.

Throughout the PIP period, Dr. Bushnell met with Dr. Liu nearly every week to discuss his assignments and progress. Dr. Bushnell also provided him with written feedback on his work, and he was given three opportunities to submit satisfactory assignments. Dr. Liu did not satisfactorily complete all his assignments. As to the assignments related to organizing, uploading, and analyzing data, Dr. Liu was unable to properly format his data, despite being given examples from other researchers in the lab. On the literature review assignments, Dr. Liu plagiarized portions of his literature summaries not only in his initial submission, but also in his revised submissions. Dr. Liu has acknowledged that the work he submitted was plagiarized, but he has explained his conduct by noting that the literature reviews were not being submitted for publication and asserting that the literature review assignments were beyond his skill level.

## V.     Suspension

Meanwhile, on May 7, 2015, Dr. Bushnell observed Dr. Liu working on what appeared to be a journal article manuscript. When she reminded him that he should not be using laboratory time to work on outside projects, Dr. Liu responded that the manuscript had been approved by a previous NIH center, so it was related to his work. After additional discussions with Dr. Liu, Dr.

8

Bushnell asked him to provide her a copy of the manuscript. Dr. Liu refused, asserting that the information in the manuscript was confidential and that his co-authors would not consent to its disclosure. Dr. Bushnell informed Dr. Liu that, per NIH policy, she had to review and approve any manuscript sent for publication, and that all data used in the manuscript should be available for her review. Dr. Liu again refused to provide the manuscript and data, asserting that the manuscript had already been reviewed and approved by previous supervisors, who were his co-authors. Dr. Liu then submitted the manuscript to a journal for publication.

At that point, Dr. Shurtleff informed Dr. Liu that the manuscript was subject to Dr. Bushnell's review. After receiving the manuscript, Dr. Bushnell discovered that it was not, as Dr. Liu had claimed, the same manuscript that had previously been approved by a different NIH unit. On May 21, 2015, based on Dr. Liu's repeated refusals to provide her with the manuscript, Dr. Bushnell recommended that Dr. Liu be suspended for three days. Liffers later upheld the suspension, but allowed Dr. Liu to serve it over a weekend, to lessen its financial impact.

## VI. Termination

Throughout Dr. Liu's tenure in the lab, other personnel had observed him raising his voice and speaking disrespectfully and aggressively to Dr. Bushnell. On July 14, 2015, these interactions came to a head. At a meeting to discuss his progress on his PIP assignments, Dr. Liu was, in Dr. Bushnell's estimation, "agitated, angry and rude." J.R. 1460. In front of a number of other personnel, he stated that he should not have to do his PIP assignments, which he deemed to be unfair, and he laughed at Dr. Bushnell and asserted that she could not complete data analyses herself. After that interaction, a lab member approached Dr. Bushnell and told her that some of the trainees had been unnerved by the exchange and now felt uncomfortable in Dr. Liu's presence. Dr. Bushnell therefore asked for Dr. Liu to be physically moved out of her laboratory

while he continued work on his PIP assignments. In support of such a move, Dr. Bushnell also noted that when Dr. Liu asked a post-doctoral fellow for assistance with statistical analysis required by a PIP assignment, the fellow had complied because he felt "uncomfortable" declining to assist. J.R. 1460. She asserted that it was "extremely difficult for the younger people in my lab to refuse to help him." *Id.*

By July 16, 2015, Dr. Liu had been moved to another building. When Dr. Bushnell went to his new location on July 20, 2015 to discuss the PIP assignments, another researcher observed that Dr. Liu was "agitated" and "aggressive," to the point that she considered calling the NIH police. J.R. 1464. In a July 22, 2015 email to Dr. Shurtleff, Liffers, and others, Dr. Liu complained that his PIP assignments were unfair, including because he was asked to conduct tasks beyond his responsibility level, he was disadvantaged in conducting literature reviews because English is not his native language, and the method of statistical analysis he had been directed to use was not appropriate. Although Dr. Liu asked to be reassigned to another laboratory, Liffers responded that no discussion of a reassignment could take place while he remained on the PIP.

The PIP period expired on July 27, 2015. In a July 30, 2015 letter to Dr. Liu, Dr. Bushnell recommended that he be terminated from his position because his performance continued to be unacceptable in the critical elements addressed in the PIP. Dr. Bushnell then met with Dr. Liu to inform him of her recommendation. Dr. Liu was immediately placed on administrative leave and was barred from the NIH campus for the duration of that leave.

Dr. Liu challenged the proposed termination before Dr. Shurtleff. He asserted that any problems with the data he collected for various experiments were the result of poor guidance by the Principal Investigators. He further asserted that the literature review assignments were

"illegal" because they were not included in his Employee Performance Plan. J.R. 52. More generally, he claimed that Dr. Bushnell's assessment of his deficiencies was subjective, retaliatory, and the result of unspecified discrimination. On August 31, 2015, after conducting his own investigation, Dr. Shurtleff agreed with Dr. Bushnell's recommendation and terminated Dr. Liu effective immediately.

## VII. EEO Complaints

While his PIP period was progressing, Dr. Liu submitted a discrimination complaint to NIH's Equal Employment Opportunity ("EEO") office. In his June 9, 2015 Complaint, he asserted that the implementation of the PIP was the result of race, national origin, sex, and age discrimination. He also asserted that the January 2015 denial of his promotion to GS-12 was the result of discrimination. Dr. Bushnell learned of Dr. Liu's allegations by June 30, 2015, when she was interviewed about his claims. Dr. Liu's claim about promotion was later dismissed as time-barred.

On July 31, 2015, Dr. Liu amended his EEO Complaint to include, in addition to his allegation about the PIP, three new claims of discrimination: (1) that he had yet to receive a response to his May 2015 conference travel request, (2) that Dr. Bushnell had proposed he be terminated, and (3) that he was terminated. Dr. Liu also expanded his allegations to include a claim of retaliation in the form of his termination. As part of his allegations of discrimination in issuance of the PIP, Dr. Liu alleged disparate treatment in that Latoya Hanson, an African American woman who also worked in Dr. Bushnell's lab and had the same position as Dr. Liu, had made mistakes in her experiments but had not been subjected to a PIP. During the EEO investigation, Dr. Bushnell responded to this allegation by stating that although Hanson had participated in an experiment in which one group of animals had responses to treatment that

11

proved to be inconsistent with the responses of other groups, which suggested that one of the parameters may have been incorrect, there had been no showing that Hanson had made a mistake, and she had always received high ratings on her performance evaluations.  On September 13, 2016, the NIH EEO Office issued its final agency decision that Dr. Liu had not been subjected to discrimination on the basis of race, national origin, sex, age, or color, and had not been subjected to unlawful retaliation.

On June 7, 2016, Dr. Liu filed an appeal to the Merit Systems Protection Board ("MSPB").  Dr. Liu was represented by counsel, and the parties engaged in extensive discovery, including interrogatories, document production, requests for admission, and depositions.  The process culminated in a three-day hearing that included witness testimony, followed by briefing by the parties.  In a written opinion, the MSPB administrative judge affirmed the decision to terminate Dr. Liu's employment, finding that NIH had a valid appraisal plan and performance standards, that Dr. Liu's performance standards were communicated to him, that Dr. Liu's performance was unacceptable in at least one of the critical elements of the performance standards, that he was warned of that unacceptable performance, and that he was given a reasonable opportunity to improve his performance but failed to do so.  The administrative judge also found that Dr. Liu had failed to establish by a preponderance of the evidence that his termination was the result of illegal discrimination.  Although Dr. Liu, now self-represented, appealed that determination, the appeal was never heard by the MSPB because that body lacked a quorum.

On May 19, 2017, Dr. Liu filed suit in this Court against Dr. Bushnell, Dr. Shurtleff and Liffers.  Dr. Liu's Complaint does not include specific causes of action, but the Court construes it to assert five claims:  (1) unlawful discrimination on the basis of race, color, national origin,

and sex, in violation of Title VII; (2) unlawful discrimination on the basis of age, in violation of the ADEA; (3) a hostile work environment, in violation of Title VII and the ADEA; (4) unlawful retaliation, in violation of Title VII and the ADEA; and (5) perjury in violation of federal law, specifically 18 U.S.C. § 1621 and 28 U.S.C. § 1746, and Maryland law, Md. Code Ann. Crim. L. § 9-101(3) (West 2002).

## DISCUSSION

### I.    Motion for Recusal

Dr. Liu has filed a Motion for Recusal in which he asks the Court to order that Counsel for Defendants, Assistant United States Attorney Evelyn Cusson, recuse herself from this case, arguing that she has a conflict of interest because (1) she investigated, then rejected, his requests that criminal perjury charges be brought against Dr. Bushnell and Susan Andorfer, the NIH attorney in the MSPB proceedings; and (2) she has an inherent conflict of interest because she is employed by the Department of Justice.

Dr. Liu asserts that, as part of the MSPB proceedings, Dr. Bushnell and Andorfer committed perjury by asserting that Dr. Bushnell met with Dr. Liu on May 8, 2015 to inform him of his unacceptable performance ratings. According to Dr. Liu, no such meeting took place on that day. In a letter dated May 27, 2017, Dr. Liu reported the alleged perjury to the United States Attorney General for a criminal investigation. On June 5, 2017, he was sent a form letter stating that a response or update to his complaint would be sent within 60 days. Dr. Liu asserts that Cusson must have been involved in investigating his criminal complaint because Cusson notified this Court of her intent to file the present Motion to Dismiss on August 9, 2017, which was after the date by which the investigation into his criminal complaint would have been completed. Cusson has disavowed any role in that investigation.

13

Dr. Liu's pure speculation that Cusson was involved in the investigation into his allegations of perjury is an insufficient basis to demand Cusson's recusal. Dr. Liu also provides no authority in support of his contention that there is an inherent conflict of interest arising from a Justice Department attorney representing Dr. Bushnell and Liffers. The statutory provision he cites in support of this contention, 15 U.S.C. § 687f, which is part of a statutory scheme to improve the flow of capital to small businesses, is inapplicable to this case. The Motion for Recusal is denied.

## II. Motion to Dismiss, or in the Alternative, Motion for Summary Judgment

In their Motion to Dismiss or, in the Alternative, for Summary Judgment, Defendants first assert that they are not proper defendants for the discrimination claims, because claims under Title VII and the ADEA are to proceed against the head of the agency—here, the Secretary of Health and Human Services—not individual defendants. They assert that the discrimination claims fail because Dr. Liu has not established a *prima facie* case of unlawful discrimination because he cannot demonstrate that his job performance was satisfactory, and that in any event he cannot establish that the proffered, non-discriminatory reasons for his dismissal were pretextual. Defendants also argue that Dr. Liu's retaliation claim fails for similar reason, that there is insufficient evidence to establish a hostile work environment claim, and that Dr. Liu cannot state a claim for perjury because the statutory provisions he cites do not provide a private right of action.

### A. Legal Standard

Defendants move to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Defendants have attached the entire administrative record of the MSPB proceedings to their

Motion. However, because, as Dr. Liu has made clear, this case is not an appeal of that proceeding, the Court may consider that record only if it construes the Motion as a motion for summary judgment. Fed. R. Civ. P. 12(d). A court may do so only if it gives the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Id.* The notice requirement is not onerous, requiring only that the nonmoving party be aware that material outside the pleadings is pending before the Court. *Id.* Here, Defendants explicitly stated in the title of their Motion that they are seeking summary judgment. Dr. Liu received that Motion, as evidenced by his filing of an Opposition to it, and he received a letter from the Court instructing him on the standards and procedures for motions under Rules 12 and 56.

The "reasonable opportunity for discovery" requirement has been met because Dr. Liu has had the opportunity to file an affidavit or declaration under Rule 56(d), or to make an equivalent statement, providing specified reasons that without discovery he cannot "present facts essential to justify [his] opposition" Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002); *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 341 (D. Md. 2011). Dr. Liu has provided no such statement. He has, however, stated that there are "new facts" that have emerged since the MSPB proceeding. Opp'n at 4, ECF No. 26. The facts to which he refers appear to relate to his allegations that Dr. Bushnell committed perjury in her assertion that she informally met with Dr. Liu on May 8, 2015

15

to apprise him of his unacceptable performance ratings, in advance of the May 21, 2015 issuance of the PIP. But Dr. Liu has known of that assertion since at least July 2015, because it is included in Dr. Bushnell's proposed removal letter. Because Dr. Liu has already had an opportunity to cross-examine Dr. Bushnell about any meeting on May 8, 2015 as part of the MSPB hearing, the Court finds that Dr. Liu has not presented a persuasive reason for further discovery. In light of the extensive MSPB record, some of which Dr. Liu attached to his Complaint and to his Opposition to the Motion, and the lack of a showing of the need to expand on that record, the Court considers Defendants' Motion as one for summary judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

Because Dr. Liu is self-represented, his submissions are liberally construed. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, the Court must also abide by the "affirmative

obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (citing *Celotex,* 477 U.S. at 323–24).

### B. Title VII and ADEA Claims

#### 1. Proper Defendant

Defendants correctly assert that claims under Title VII and the ADEA must name the head of the department or agency, not individual supervisors, as the defendant. *See* 42 U.S.C. § 2000e-16(c) (providing that in a civil action under Title VII "the head of the department, agency, or unit, as appropriate, shall be the defendant"); *Stoyanov v. Mabus,* 126 F. Supp. 3d 531, 540 (D. Md. 2015) (dismissing all defendants other than the Secretary of the Navy, who was the only proper defendant for claims of discrimination under Title VII and the ADEA arising from employment in the United States Navy). Because Defendants consent to substitution of Secretary of Health and Human Services Alex M. Azar, II as a Defendant in this case, the Court will dismiss all Title VII and ADEA claims against the named Defendants and will substitute Secretary Azar as the Defendant for the employment discrimination claims.

#### 2. Discrimination Claims

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual" over the age of 40 "because of such individual's age." 29 U.S.C. §§ 623(a)(1); 631(a). To prove discrimination under the ADEA, a plaintiff must demonstrate that age was the "but for" cause of such treatment. *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177 (2009); *EEOC v. Balt. Cty.,* 747 F.3d 267, 273 (4th Cir. 2014).

To evaluate Title VII and ADEA claims when, as here, there is no direct evidence of discriminatory intent, courts apply the burden-shifting analysis outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Gross,* 557 U.S. at 177–78; *Adams v. Trs. of the Univ. of N.C.-Wilmington,* 640 F.3d 550, 558 (4th Cir. 2011); *Laber v. Harvey,* 438 F.3d 404, 430 (4th Cir. 2006). The burden is first on the plaintiff to establish a *prima facie* case of discrimination. *Adams,* 640 F.3d at 558. Upon such a showing, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct. *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir. 2004)). If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported reasons are a "pretext for discrimination." *Id.* at 558-59 (quoting *Hill,* 354 F.3d at 285).

To establish a *prima facie* case of race, color, national origin, sex, or age discrimination based on disparate treatment, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class, (2) the plaintiff's satisfactory job performance, (3) that the plaintiff was subjected to an adverse employment action, and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., Inc.,* 375 F.3d 288, 295 (4th Cir. 2004). When the claim is discriminatory termination, the elements alter slightly. A plaintiff must then present facts demonstrating: (1) the plaintiff's membership in a protected class, (2) that the plaintiff was terminated, (3) that at the time of the termination, the plaintiff was performing at a level that met the employer's legitimate expectations, and (4) that the position was filled by a similarly qualified applicant from outside the protected class or, as to age discrimination, with a substantially younger worker. *King v.*

*Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (Title VII); *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002) (ADEA).

There is no dispute that Dr. Liu is a member of a protected class and that he was subjected to a PIP and then terminated. Defendant, however, contends that Dr. Liu has not and cannot establish that at the time of these personnel actions, he was performing at a level that met NIH's legitimate expectations. The undisputed materials facts in the record, even viewed in the light most favorable to Dr. Liu, establish that Defendant is correct.

The reason given for Dr. Liu's termination was his inability to satisfactorily complete any of the assignments in his PIP. The PIP was prompted by Dr. Bushnell's findings that, among other things, Dr. Liu had been unable to develop a viable experiment protocol for the capsaicin/histamine study or to provide adequate research summaries of other such studies, had been inconsistent in his ratings of the rat and mouse pain videos and unable to organize those ratings into the required format, and had been disrespectful to her and others during staff meetings.

The PIP assignments largely fell into two categories: (1) literature reviews, and (2) data collection and organization. Turning first to the literature reviews, as no one disputes, some portion of the literature reviews that Dr. Liu submitted were plagiarized, and his reviews continued to contain plagiarized portions over the course of three revisions. In repeatedly plagiarizing his summaries, Dr. Liu necessarily failed to demonstrate his own "superior understanding of the pain research area," one of the critical elements of his Employee Performance Plan. J.R. 109. Considering that the primary focus of Dr. Bushnell's laboratory was pain research and Dr. Liu was hired to help conduct that research, this critical element was a legitimate performance expectation for Dr. Liu. In light of these facts, Dr. Liu's repeated

contentions that such literature reviews were beyond the scope of his Employee Performance Plan, or were a task too advanced for his pay grade, are unpersuasive. More fundamentally, plagiarism is basic research misconduct, as stated in NIH guidelines for the conduct of research. Plainly, Dr. Liu could not have been meeting NIH's legitimate performance expectations when he repeatedly engaged in such misconduct.

As part of his PIP, Dr. Liu was also supposed to run certain data through an Analysis of Variance ("ANOVA") statistical analysis. At points, Dr. Liu suggested that he resisted that task because he believed the specific statistical analysis was ill-suited to the data. At other points, he suggested that he resisted it because he lacked the necessary statistical training to conduct the analysis. However, as no one disputes, Dr. Liu failed adequately to complete the statistical analysis, such that he did not "[c]onduct[] day-to-day operations of relevant protocols," one of the critical elements of his Employee Performance Plan. J.R. 103. In light of the critical element that Dr. Liu be able to "evaluate research data using appropriate analytical tools and programs," J.R. 102-03, his unwillingness or inability to conform his work to defined experiment protocols is a deficiency going to the core of his position as a researcher, and thus was a failure to meet a legitimate performance expectation. Because the record establishes that Dr. Liu had been unable to complete assignments in a satisfactory manner, and when placed on a PIP failed adequately to complete his PIP assignments, Dr. Liu has failed to establish the *prima facie* requirement that he was meeting his employer's legitimate expectations at the time of his termination. Finally, Dr. Liu has failed to offer evidence that, as required for the fourth prong of a *prima facie* case, he was replaced by a similarly qualified person from outside his protected class, or, for his ADEA claim, someone substantially younger. *See King*, 328 F.3d at 149; *Dugan*, 293 F.3d at 721. Because Dr. Liu has failed to establish a *prima facie* case of discrimination, summary judgment

in favor of Defendant is warranted. Even if Dr. Liu had established a *prima facie* case, his deficient performance qualifies as a legitimate, non-discriminatory reason for his termination.

Finally, Dr. Liu has failed to present evidence undermining the stated reason for his termination and revealing that it was a pretext for unlawful discrimination. Dr. Liu has provided no competent evidence that any of the events at issue were motivated by illegal discriminatory animus. He asserts that Dr. Bushnell does not like people from China, but he acknowledges that she has another researcher in her laboratory from that country. He asserts that Dr. Bushnell prefers to hire women, but provides no evidence of the gender breakdown of her laboratory personnel, and the record establishes that there were several men in her employ. He asserts that Dr. Bushnell's reference in one email to her "younger" laboratory members is evidence of age-based discriminatory animus, but that comment, that it was "extremely difficult for the younger people in my lab to refuse to help [Dr. Liu]," J.R. 1460, related to Dr. Bushnell's concern that younger employees were reluctant to refuse requests from Dr. Liu, not to any expressed preference for younger personnel.

Dr. Liu also argues that an African American lab member, Latoya Hanson, was treated more favorably than him when she was not placed on a PIP for making a mistake in the laboratory, which he asserts is a form of disparate treatment. But Dr. Bushnell clarified that although she had noted that an experiment on which that researcher was working had had unusual results, there was no clear indication that the results were caused by human error and, if they had been, no way to determine whether that researcher, or anyone else, had made an error in the experiment. There is also no evidence that Hanson had a series of unsuccessful assignments comparable to those of Dr. Liu. Beyond Dr. Liu's own personal speculation, there is nothing in the record to suggest that Dr. Bushnell's decision to place Dr. Liu on a PIP and her

recommendation of termination, were based on an impermissible discriminatory motive. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion.").

Notably, it was Dr. Shurtleff, not Dr. Bushnell, who made the final decision to terminate Dr. Liu. In a discriminatory termination case, the discriminatory intent ordinarily must be harbored by the decisionmaker. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) ("It is the decision maker's intent that remains crucial ..."). In limited circumstances, discriminatory intent can be imputed to the formal decisionmaker "when that official has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else." *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (applying this principle to an alleged violation of the Uniformed Services Employment and Reemployment Rights Act, which "is very similar to Title VII"); *see also e.g., Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294-96 (10th Cir. 2013) (applying *Staub* to a Title VII national origin claim). Under this cat's paw theory of liability, evidence that a supervisor who was not the formal decisionmaker "perform[ed] an act motivated by [discriminatory] animus that [was] intended by the supervisor to cause an adverse employment action" could support a finding of discrimination "if that act [was] a proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 422 & n.3 (footnote omitted). Here, however, not only is there no evidence that Dr. Bushnell recommended Dr. Liu for termination as a result of a discriminatory animus, but Dr. Shurtleff, after receiving Dr. Bushnell's recommendation, conducted his own investigation into Dr. Liu's performance before deciding on termination.

More broadly, Dr. Liu's claim that his termination was a pretext for discrimination is significantly undermined by the fact that he was hired and fired by the same people. "[C]laims

22

that employer animus exists in termination but not in hiring seem irrational" because "it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (citation omitted). Thus, "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Id.* (finding no discrimination where an employee was fired by the same person six months after being hired by that person). The facts here give rise to that inference: Dr. Liu was suggested for his position by Dr. Shurtleff, and Dr. Bushnell agreed to hire him. Only seven months later, Dr. Bushnell recommended that he be fired, a recommendation Dr. Shurtleff approved one month later.

Finally, not only is there a dearth of evidence of discrimination, but there is ample evidence of other, non-discriminatory reasons that NIH was legitimately concerned about retaining Dr. Liu, specifically, a series of incidents in which he challenged or refused to comply with Dr. Bushnell's instructions. He was discovered working on a manuscript while in the laboratory, but then repeatedly refused to allow Dr. Bushnell to review that manuscript or the data underlying it, in contravention of NIH policy. He attempted to order supplies for a proposed experiment despite Dr. Bushnell's express instructions not to do so and after having previously been disciplined for inappropriate supply purchases. Dr. Bushnell and a number of other members of her lab, as well as two individuals not associated with her lab, recounted Dr. Liu engaging in demeaning and disrespectful behavior towards Dr. Bushnell that at times appeared ready to erupt into violence. In short, the record does not support an inference that Dr. Liu was

subjected to disparate treatment or termination for discriminatory reasons. The Court will therefore grant summary judgment to Defendant on these claims.

### 3. Hostile Work Environment

In his Complaint, Dr. Liu asserted that he was subjected to a hostile work environment, but he provided details regarding this claim only in his memorandum in opposition to the Motion. Even if the Court were to consider those belated factual allegations, they would not suffice to state a viable claim. To advance a hostile work environment claim to trial, a plaintiff must identify evidence that: (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's race, color, religion, national origin, sex, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baquir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Here, the only facts that could potentially relate to a hostile work environment against Dr. Liu are those related to the negative feedback he received from Dr. Bushnell about his work and negative comments by other lab personnel. While such statements were certainly dispiriting,

24

they do not rise to the level of a hostile work environment. There is no evidence that Dr. Bushnell gave her negative feedback in a derogatory or demeaning tone. *See, e.g., Buchhagen v. ICF Int'l, Inc.*, 545 Fed. App'x. 217, 219 (4th Cir. 2013) (stating that allegations of the supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)). There is also no evidence that Dr. Bushnell's conduct or any statements by others included the necessary component of "discriminatory intimidation, ridicule, and insult," such as epithets or derogatory language relating to Dr. Liu's membership in any protected class. *See Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). Defendant is therefore entitled to summary judgment on Dr. Liu's hostile work environment claim.

### 4. Retaliation

Dr. Liu also asserts a retaliation claim based on the fact that he was terminated after he filed a complaint with the NIH EEO Office. A retaliation claim may be analyzed under the *McDonnell Douglas* burden-shifting framework. *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550–51 (4th Cir. 2006). If Dr. Liu establishes a *prima facie* case of retaliation, the burden shifts to Defendant to show a legitimate, non-retaliatory reason for terminating him. *See id.* at 551. If Defendant makes such a showing, the burden then shifts back to Dr. Liu to show that the stated reason was pretextual and that retaliation was the "actual reason" for his

termination. *See Foster v. University of Md.—Eastern Shore*, 787 F.3d 243, 253–54 (4th Cir. 2015).

To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff; and (3) "there was a causal link between the two events." *Boyer-Liberto*, 786 F.3d at 281. Causation must be established at two stages of the *McDonnell Douglas* framework: first, in making a *prima facie* case, and second, in proving pretext and satisfying the ultimate burden of persuasion. *Foster*, 787 F.3d at 250. The difference between the two stages is that the burden for establishing causation at *the prima facie* stage is "less onerous." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). At this stage, causation may be proven by the proximity between when the protected activity took place and when the employee was terminated. *See id.* ("Appellant's proof of a causal connection between the protected activity and her discharge essentially was that she was fired after her employer became aware that she had filed a discrimination charge. While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.").

Here, Dr. Liu engaged in protected activity when he filed his EEO complaint on June 9, 2015 and was subjected to an adverse employment action when he was terminated on August 31, 2015. As for the causation prong, Dr. Bushnell learned of Dr. Liu's EEO complaint by June 30, 2015, when she was interviewed about his claims. She recommended Dr. Liu's termination one month later, on July 30, 2015. It is not clear from the record when Dr. Shurtleff, who made the final termination decision, learned of Dr. Liu's EEO complaint, but he was likely aware of it by the time Dr. Liu was formally terminated on August 31, 2015. Viewed in the light most

favorable to Dr. Liu, the proximity between when Dr. Bushnell learned of his EEO contact and his ultimate termination satisfies the "less onerous" burden for establishing causation at the *prima facie* stage. *See Williams*, 871 F.2d at 457.

Because Dr. Liu has established a *prima facie* case of retaliation, the burden then shifts to Defendant to show a legitimate, non-retaliatory reason for terminating him. As discussed above, Defendant has established such a reason: Dr. Liu's performance in critical elements of his job was unsatisfactory. *See supra* part II.B.2.

The burden thus shifts back to Dr. Liu to show that but for filing a complaint with the EEO Office, he would not have been terminated. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). To do so, Dr. Liu must show that (1) Defendant's reason for terminating him was false; and (2) retaliation for the EEO complaint was the real reason for terminating him. *See Foster*, 787 F.3d at 252. Viewing the evidence in the light most favorable to Dr. Liu, he has not met this burden. The reason offered for Dr. Liu's termination was his deficient performance, and the record of that deficient performance went back much farther than his June 9, 2015 EEO complaint. By the time Dr. Liu filed that complaint, he had already demonstrated deficient performance to the extent that he had been placed on a PIP—indeed, his placement on the PIP is one of the bases for his allegation of discrimination—and had already turned in several deficient PIP assignments. Thus, Dr. Liu's filing of an EEO complaint did not set any disciplinary actions into motion. Rather, the disciplinary actions and deficient performance that culminated in his termination were well underway before his Complaint was filed. In light of the extensive history of deficient performance pre-dating the EEO complaint, Dr. Liu has not presented evidence that would establish that Defendant's proffered reason for

terminating him was false and that retaliation was Defendant's real reason for his dismissal. Defendant will be granted summary judgment on Dr. Liu's retaliation claim.

### C.    Perjury

Dr. Liu asserts a claim of perjury against Dr. Bushnell and Liffers based, it appears, on their assertions that Dr. Bushnell informally met with Dr. Liu on May 8, 2015 to give him his performance appraisal. Two of the statutes that Dr. Liu cites for this cause of action, 18 U.S.C. § 1621 and Section 9-101 of the Criminal Law Article of the Maryland Code, are criminal statutes that make no mention of a private right of action. *See* 18 U.S.C. § 1621 (2012); Md. Code Ann., Crim. L. § 9-101; *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) (stating that determining whether a statute contains a private right of action "must begin with the language of the statute itself"). The remaining statute, 28 U.S.C. § 1746, is no more helpful. It simply prescribes the proper form of, and evidentiary weight to be accorded to, unsworn declarations. 28 U.S.C. § 1746 (2012). Because Dr. Liu cites no statute providing a private right of action for a civil claim of perjury, Defendants will be granted summary judgment on this claim.

### CONCLUSION

For the foregoing reasons, Dr. Liu's Motion for Recusal is DENIED, Defendants' Motion for Summary Judgment is GRANTED, and this case is DISMISSED. A separate Order shall issue.

Date:   June 22, 2018

THEODORE D. CHUANG
United States District Judge

28